# Backus's Appeal.

1. In a case in equity depending upon oral testimony, the judge should refer it to a master to sift the testimony, and collate and report the facts.

2. Standing timber was sold—by the contract the quantity was to be determined by three referees named: after an examination and measurement of the timber, one of the referees fell sick and the others made an estimate and report. The sale of the timber was the true subject of the contract, and to prevent a failure of the principal matter, equity might furnish means of ascertaining the quantity if the contract had failed without fault of the party, or its execution became impossible by fortuitous causes.

3. But where the bill is founded on the contract, asserting that a true estimate had been made according to its terms, a full and fair performance of the contract-mode of ascertaining the price of the timber must be shown.

4. It was the right of each party to have the benefit of the skill, observation and suggestions of all the referees in making up the estimate.

5. Equity will not decree specific performance, except where it would be strictly equitable to make such decree.

6. An agreement to be carried into specific execution, ought to be certain, fair and just in all its parts.

7. A defendant may resist a decree, on evidence which would be insufficient to establish the case of a plaintiff.

[Backus's Appeal.]

8. The specific performance of an award rests on the sound discretion of the court; if it appears that there are just objections to enforcing it equity will not interfere.

March 25th 1868.　Before STRONG, READ, AGNEW and SHARSWOOD, JJ.　THOMPSON, C. J., at Nisi Prius.

Appeal from the Court of Common Pleas of *McKean county*.

This was a bill by L. W. Crawford against John C. Backus to compel the specific execution of a contract for the sale of timber by the defendant to the plaintiff, and to restrain defendant from cutting the timber.

The bill was filed, December 29th 1866.

By the contract dated February 20th 1866, Backus agreed to sell and convey to Crawford all the pine and cherry timber on a lot of 114 acres of land bought of Daniel Kingsbury, and all the cherry timber on two other lots, one of 50 and the other of 70 acres known as the Tainter lands, at "$4 per thousand feet, the amount to be ascertained by some disinterested persons, to be agreed upon by the parties, counting said trees, and estimating the amount of said timber, this agreement to remain in force for and during the term of 30 days from the date and no longer."

On the 6th of June 1866, the parties entered into another contract, "in furtherance of (the) contract of February 20th 1866." By this contract "it is agreed that J. E. Blair, Aaron Hagadorn and A. D. Hamlin shall go upon the ground and carefully estimate all the pine and cherry timber growing and standing and down and suitable for sawing on the lots hereinafter described, and ascertain the quantity of such timber, and shall make a report in writing to the said Backus and the said Crawford, which estimate and a report, signed thereof by them or any two of them, shall as between the parties hereto be deemed conclusive as to the quantity of said timber.　That said Crawford shall pay to said Backus at the date hereof the sum of five hundred dollars to apply towards the payment thereof.　When said report shall be made, said Backus shall execute, make and deliver to said Crawford, his heirs or assigns, a proper conveyance vesting the title to all the pine and cherry timber on the 'Tainter lot,' No. 70, containing 113 5-10 acres, &c., and all the cherry timber growing and being on lot No. 105 of the Bingham allotment of lands in Lafayette township containing 51 2-10 acres, and lot No. 104 of said Bingham allotment containing 73 8-10 acres, being, &c.　Whereupon said Crawford binds himself to pay said Backus the balance which shall be due for said timber, according to the said agreement of February 20th 1866, which is at the rate or price of four dollars per thousand feet, and it is further agreed that if said Crawford shall fail to pay or tender the balance which shall be due for said timber for the space of twenty days after the said report shall be delivered to him, and the title aforesaid offered him therefor,

then this agreement shall cease and determine, and the amount now paid forfeited.

" The expense of estimating the timber is to be divided equally between the parties hereto and paid by them.   In case the parties above named agreed on to estimate the timber fail to act, it is agreed that Byron D. Hamlin shall select other competent persons for that purpose whose action and report shall be as binding as if made by said Blair, Hagadorn or Hamlin."

Subsequently the following report was made :—

" Lafayette, September 10th 1866.
" We, the undersigned, men chosen by J. C. Backus and L. W. Crawford, to estimate certain pine and cherry timber, situate on certain lots of land in Lafayette township, McKean county, Pa., do estimate and return as follows :—Amount of pine four hundred thousand .feet.   Amount of cherry on two lots two hundred and eighteen thousand nine hundred and forty feet.   Total—six hundred and eighteen thousand nine hundred and forty feet.

JAMES E. BLAIR,
AARON HAGADORN."

The defendant refused to make a conveyance of the timber, and the plaintiff filed this bill.

The bill sets out—1st, the contract of February 20th 1866; 2d, 3d and 4th, the contract of June 6th 1866, and the payment of the first $500; 5th, that the estimate was made by the persons agreed on, and there was found to be 400,000 feet of pine timber and 218,940 feet of cherry, and the report delivered to the parties about September 10th 1866, the bill stating the finding of the report; 6th, avers that plaintiff has complied with his part of the agreement; 7th, that the defendant refuses to make a conveyance of the timber; 8th, that the defendant is cutting timber on the lots, &c.

The prayer is for a decree compelling the defendant to make a deed according to the contract, and restraining him from cutting the timber, &c.

The answer, 1. Admits making the first contract, denies that there was any consideration, avers that it became inoperative after 30 days from its date.   2. Admits the second contract and the payment of $500, and avers that it provided in case either of the referees should refuse to act, that B. D. Hamlin should select a person to fill the vacancy.   3. Has these averments :—" I deny that any report was made by the persons agreed upon in the contract of 6th June 1866, as stated in the 5th paragraph of the . plaintiff's bill, and I also deny that the said persons agreed upon in said contract or any or either of them ever made a report in writing to me of their estimate of the quantity of timber on the land described in said contract.   I aver and state that A. D.

Hamlin, one of the persons agreed upon, never made a full examination of the said timber; that the said Blair and Hagadorn made an examination of a portion thereof in the absence of the said Hamlin; that when the said Blair, Hagadorn and Hamlin were looking at said pine timber, or that portion thereof which was examined by all of them together on the ground, the said Hamlin frequently estimated the number of logs in a tree, and his estimate exceeded the estimate of the said Blair, and when the matter was referred to said Hagadorn, he would coincide with the said Hamlin in his estimate, but the said Blair in his minutes would note the said tree as containing his own instead of the estimate made by said Hamlin and Hagadorn, and the said Hagadorn kept no minutes of the estimates made of said pine timber when they were making the examination on the ground. I also aver that the said Hamlin was not present at any figuring up of the estimates or at any consultation with the said Blair and Hagadorn about the quantity of the said pine and cherry timber after the examination had been made, and had no notice of the time and place of such consultation or of making the award, but that the whole calculation of the amount and quantity and the making of the award was done by the said Blair and Hagadorn in the absence of the said Hamlin, with the aid and assistance of the said plaintiff, in my absence, and without my knowledge and consent." 4. Denies the tender of the full amount of the consideration; 5, avers that the timber amounted to 800,000 feet of pine and 400,000 feet of cherry; 6, notice was served on the plaintiff and the referees of the revocation of their authority, and on the plaintiff of the amount of timber. 7. Plaintiff has refused to have any other estimate made, defendant has tendered a return of the $500 with interest, and given notice of a rescission of the contract, because the estimate was not in accordance with its terms and was palpably erroneous, as not having more than half the timber, and plaintiff refused to have a new estimate.

The plaintiff filed a general replication and an examiner was appointed.

The testimony taken was very voluminous; a detail of it would not assist in elucidating the questions decided in the case.

There was evidence that the three referees went through the timber, counted and measured it, took memoranda in the woods of their work; before there was an opportunity to determine upon the other matters necessary for a final decision by the referees, and for making the report, Hamlin one of the referees was taken quite ill, so as to be unable to be consulted in the matter. The plaintiff urged the completion of the report during Hamlin's sickness, expressing his belief that it was not probable that Hamlin would recover; plaintiff was present with the other referees when they were making their calculations and consulting as to the re-

[Backus's Appeal.]

port, made suggestions to them as to the correctness of their figures, estimates, &c. The defendant by a number of witnesses, experienced lumbermen, gave evidence that the timber was greatly under estimated; their estimates varied from 950,000 to about 1,100,000 feet of pine timber; the cherry timber was estimated at about 675,000 feet; there was evidence of declarations of the plaintiff that there was about twice as much timber as had been estimated in the report. There was some conflict in the evidence; the referees who were examined adhering to the accuracy of their report. There was also evidence tending to show the delivery of the report to the defendant, and that he did not object to it; and that both parties acted on it.

The case was heard twice in the court below before Williams, A. J., who, on the first hearing, after some preliminary discussion of the questions raised by the bill and answer, said, "The objections made to the estimate are, 1st, That it is so grossly erroneous as to amount to a fraud on defendant.

"2d. That it was not made by the persons in the agreement.

"3d. That Blair and Hagadorn are chargeable with misconduct in permitting the plaintiff to 'aid and assist in the calculations on which the award was made.'

"4th. That the report does not cover the ground submitted, but omits to furnish a statement of the cherry upon one of the lots."

Having examined these objections, he held that the first three were not sustained, but that the last objection was well taken, and concludes:—

"To the end, however, that the parties may in this action settle and adjust their rights under the contract, and bring all the questions raised under review at the same time, we have concluded to hold the case open until the next term of the court, that the parties may have opportunity to take such further action in the mean time as they may deem necessary for that purpose."

The court accordingly made a decree restraining the defendant from cutting timber and holding the prayer for specific execution open until the next term with leave to file a supplemental report.

All the referees afterwards made this additional report:—

"We, the undersigned, men chosen by J. C. Backus and L. W. Crawford, to estimate certain pine and cherry timber on certain lots in Lafayette, do certify that we have this 18th day of September, A. D. 1867, estimated all the cherry timber being on the Tainter lot, No. 70, being the pine lot spoken of in a contract dated June 6th 1866, between J. C. Backus and L. W. Crawford, and we do find said cherry timber to contain five thousand eight hundred and ninety-two feet.—September 18th 1867."

Additional testimony was taken in relation to the accuracy of the estimates; amongst others, Hamlin one of the referees, testi-

[Backus's Appeal.]

fied :—" I assisted in making an estimate and measurement of the timber ; the subject was discussed between us some time in July, when we were going from the estimate of the cherry, and after we estimated the pine, as to the estimate of the pine, and Blair and I thought and expressed to each other that we had estimated the tops of the standing trees too low, and had got too few logs in some of the trees ; we came to this conclusion from having measured down pine and knowing their size at the tops and length ; I never changed my figures made in my book at the time of the estimate ; I had nothing to do with Blair and Hagadorn in making up the report ; I had no notice from them of the time of making the report ; had I been present at the making of the report I would not have consented to the report being made without first changing some of the figures, so as to make the amount of the pine larger. * * * My opinion as to the measurement of the pine is still that it was not large enough. My opinion is that about 100 of the pine trees should have been made 14 to 16 inches in diameter at the top, where they were put down 12 inches, and when they were called six logs they should have been called seven. I should presume this would add from one-fourth to one-third, or probably would make 150,000 difference, may be more ; it is only a guess. * * * When I say I would not have signed the report without the figures being changed, I mean that this conclusion was formed at the time we made the first estimate."

On the second hearing the court decreed a specific execution of the contract. The defendant appealed and assigned this decree for error.

*R. Brown* and *W. A. Williams*, for appellant.—The authority given to referees should not be exceeded or imperfectly exercised : Caldwell on Arbitration 226, 238, 243, 201, 208 and notes. Speer *v.* Bidwell, 8 Wright 23 ; Conano *v.* Castlebury, 29 Geo. 495, 2 Story's Eq. § 145 ; Sellick *v.* Adams, 15 Johns. 197.

Tender of unpaid purchase-money is necessary, at least before a decree : Marlin *v.* Willink, 7 S. & R. 297 ; Patterson *v.* Wilson, 7 Harris 380.

Specific performance is a matter of grace : Greenlee *v.* Greenlee, 10 Harris 235 ; Davidson *v.* Little, Id. 251 ; Brawdy *v.* Brawdy, 7 Barr 158 ; Farley *v.* Stokes, 1 Pars. R. 429, Bright. Eq. § 221 ; Patterson *v.* Martz, 8 Watts 379.

A court of equity will not entertain jurisdiction in this case, as the rights of the plaintiff can be enforced by an ejectment and estrepement : Rhea *v.* Forsythe, 1 Wright 507 ; North Pa. Coal Co. *v.* Snowden, 6 Id. 490.

*B. D. Hamlin* and *A. G. Olmstead*, for appellee.—The acceptance of the report without objection, and acting on it, amounted

[Backus's Appeal.]

to a waiver: Sellick *v.* Adams, *supra*; 2 Pars. on Contr. 700, and notes.

The action of the referees was in compliance with the agreement: Kingston *v.* Kincaid, 1 W. C. C. R. 148; Phippin *v.* Stickney, 3 Met. 384; Hill on Vend., part 2, p. 132–135; Stuart *v.* Luddington, 1 Rand. 403, 2 Pars. on Cont. 701–703, and notes; Caldwell on Arb'n. 158, 159, 165, 172, 176, and notes; Mon. Nav. Co. *v.* Fenlon, 4 W. & S. 214, Bright. Eq., §§ 69, 70, 493, 494.

Tender need not be averred, if the party alleges readiness and willingness to perform: Bright. Eq., p. 189, Chess's Appeal, 4 Barr 52; Eq. Draftsman 526.

A naked submission may be revoked, but a contract cannot be: McGheehen *v.* Duffield, 5 Barr. 497; Mon. Nav. *v.* Fenlon, *supra*, 3 Pars. on Cont. 378, note, 2 Id. 710; Caldwell on Arb'n. 76, 77. The parties were bound by the judgment of their chosen tribunal: Reynolds *v.* Caldwell, 1 P. F. Smith, 298; O'Reilly *v.* Kerns, 2 Id. 214; Monongahela Navigation Co. *v.* Fenlon, *supra*; McCahan *v.* Reamey, 9 Casey 535; Lauman *v.* Young, 7 Id. 306; Inman *v.* Kutz, 10 Watts 94.

The objection that there is a remedy at law cannot be taken after an answer on the merits: Bright. Eq. Juris. 460, 461; Story Eq. Pleadings, §§ 466, 472, 606; S. & E. R. R. Co. *v.* Cooper, 9 Casey 278; Bank of Kentucky *v.* Schuylkill Bank, 1 Pars. R. 180; Neel *v.* Neel, 1 T. & H. Prac. 63; Pearsoll *v.* Chapin, 8 Wright 11; Hill on Vend., part 2, p. 300; 2 Pars. on Cont. 679, notes; Greenlee *v.* Greenlee, 10 Harris 235.

The opinion of the court was delivered, May 7th 1868, by

AGNEW, J.—In the outset of the opinion it is proper we should notice the manner in which this case is brought before us. The controversy turns upon facts, and involves a variety of circumstances. Fifty-eight witnesses were examined, whose testimony fills one hundred and twenty-three pages of solid small type. Much of the evidence is conflicting, and relates to a peculiar local business. Such a case ought to have gone to a master for a report upon the facts. We may not be able to do justice to it, as to us all witnesses appear alike when their depositions come before us on paper. No judge of the Common Pleas should take such a case on the evidence, without a reference first to a master, to sift the testimony and collate and report the facts. He should appoint some one competent to act both as examiner and master. Having heard the witnesses and familiarized himself with the case in every step of its progress, the master is more competent to determine upon the credibility of opposing witnesses, and to judge of the evidence. Being fully possessed of the case, the dispute is apt to be confined to the real grounds of controversy. It is to be hoped

the judges of the Common Pleas will follow these suggestions, and thus do justice to the parties and to their own judgments.

After a careful examination of the evidence (a labor of several days), we have come to the conclusion that the estimate of the timber made under the contract is too uncertain and doubtful to warrant a decree of specific performance. The contract falls within the scope of a chancellor's jurisdiction, and has been so far executed as to entitle the plaintiff to a decree of specific performance, but for a single fact. The parties, by their agreement, made its execution depend upon a count of the trees on the land, and an estimate of the quantity of lumber contained in them, making the payment dependent on the number of thousand feet to be found by the estimate. They agreed upon the persons to make the count and estimate the quantity, and provided for a new selection of persons in case of their failure to act. The three persons appointed did act to a partial extent, and a report was signed by the requisite number. It is the real character of this report which is the subject of dispute.

The sale of the timber is the true subject of the contract, and the count and estimate are only the means of its execution. Equity, therefore, to prevent a failure of the principal matter, might, in a proper case, furnish a means of ascertaining the quantity of lumber, if the contract made had failed without a serious fault on part of the plaintiff, or its execution had become impossible through fortuitous causes. But the plaintiff founds his bill upon the contract-means, asserting that a fair and true estimate had been made according to its terms. He must show, therefore, a full and fair performance of the contract-mode of ascertaining the price of the timber. Without this it is impossible to execute it specifically, payment of the price being as indispensable as the conveyance of the timber.

In such a mass of evidence it is impossible to discuss the facts in detail within any proper limits of an opinion. It is sufficient to indicate the points of doubt cast upon the report by the entire volume of the testimony. The first matter to be noticed is the admitted defect in the report, apparent on its face, to wit, the entire omission to estimate the cherry timber on the first-mentioned tract. Had this been the only objection to the report, and merely the result of an oversight or misapprehension, equity might have aided the plaintiff by means of a supplemental report. But this objection, furnishing a direct ground of assault upon the report, is strengthened by the cloud thrown over the whole estimate by the conduct of the appraisers and of the plaintiff. That Hamlin, one of the appraisers, did not unite in making up the estimate which resulted in the report of the other two estimators, is beyond a doubt. He participated in counting the trees and estimating the number of logs each would cut, and also set down

8 P. F. Smith—13

[Backus's Appeal.]

some of the observations on paper, but he took no part in the computations necessary to finish the estimate and to make up the report. It is said this was only a matter of calculation. This is not correct. The papers made in the woods were to be compared, their results ascertained and suggestions made to each other before there could be a final and full calculation made. We are informed by Hamlin himself that he was not satisfied with their observations on the ground, that many of the standing trees were estimated at the top cut as of the diameter of twelve inches, which he is convinced would have cut from fourteen to sixteen inches, and many trees were estimated at six logs which would have cut seven, making a difference of probably 150,000 feet. There is evidence also that one, and perhaps both, of the other two appraisers were not fully satisfied with the conclusions made upon the ground. Hamlin had no notice of the meeting of the other two to calculate the quantity, cast up the amount and make up the report, and took no part. It was the right of each party to the contract to have the benefit of his skill and observation, and of his suggestions in making up the final estimate. No one now can know how far his views and suggestions might have influenced the minds of his coadjutors and convinced them of errors in their observations or of allowances proper to be made. It is said in extenuation that he was sick and could not be had. Under other circumstances this fact might be laid as a ground to induce a chancellor to aid the execution of the contract because of the failure of the agreed mode through an unforeseen contingency. But it will not make that good which is bad because of its consequence. The report made without Hamlin's participation in the deliberations which led to it is not saved by his sickness.

Next we have the conduct of the plaintiff. That he undertook to get up the report in the absence of Hamlin, by assisting Hagadorn and Blair to make it, is not questioned; but the question is how far his interference may have affected the result. It is quite possible he copied correctly from the book the count and observations made upon the ground, so far as he assisted to make out the paper from which he and Hagadorn calculated the quantities; and it is possible he made the calculations correctly; but how can we know this confidently? Hagadorn and Blair may have felt satisfied with his work, but it is still true that he did that which it was Hamlin's province and not his to do. It is just here that the evidence of the actual quantity of the timber on the ground makes its deepest impression. The report estimates the quantity of pine lumber at 400,000 feet, and of cherry at 218,940 feet. Since the report, the trees have been counted and estimated by various witnesses, many of them experienced lumbermen, at 950,000, 965,000, 979,000 and 1,053,000 feet of pine. One estimate,

[Backus's Appeal.]

founded upon an average obtained from twenty trees, gave 1,121,324 feet of pine. The cherry trees were estimated at 676,077 feet, of which those on the first-mentioned tract, omitted from the report, made 10,829 feet. Now, allowing a large margin for errors and for rotten timber, yet the disparity between the number of feet estimated by the appraisers in their report and that estimated by many others equally competent leaves upon the mind a painful uncertainty as to the fidelity of the report, which, connecting itself with the conduct of the appraisers and the interference of the plaintiff, renders it difficult to be assured that a decree founded upon it will be based upon justice and fairness. Here it is we think the learned judge committed an error. Instead of looking at the question with the conscience of a chancellor, who is moved to make a decree only by a full conviction of the equity and fairness of the estimate, he viewed it as a mere law judge determining upon the legal effect of the report. Having satisfied himself that the evidence was insufficient to establish a clear case of fraud, he then determined that at law the report was final and conclusive between the parties, and decreed accordingly. But in cases of specific performance, courts of equity will not interfere to decree performance, except where it would be strictly equitable to make such a decree: 2 Story's Eq., §§ 750, 750 a. An agreement, to be entitled to be carried into specific performance, ought to be certain, fair and just in all its parts: Id., § 769. A defendant may resist a decree on evidence, where evidence of a like character would be insufficient to establish the case of the plaintiff: Id., § 770. The specific performance of awards, as well as of contracts, rests on the sound discretion of the court; and if, upon the face of the award or otherwise, it appears that there are just objections to enforcing it, courts of equity will not interfere: Id., § 1459. On all the evidence, we are unable to say that the report in this case is entirely trustworthy. It is defective on its face as to the cherry timber, and it is made uncertain and doubtful by the evidence of its imperfection and the contradiction of its correctness. Without the report, or such a substitute in a case of failure as equity would resort to in aid of the contract, no decree can be made. We must, therefore, reverse the decree in this case and dismiss the bill, but in such a manner as will not impair the rights of the plaintiff under his contract.

The decree of the court below is therefore reversed, and the bill of the plaintiff dismissed at his costs, but without prejudice to the plaintiff in any future proceeding upon the contract by action, bill or otherwise.